**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ernest B. JACKSON, | No. CV-03-0563-PHX-SMM |
| Plaintiff, | **MEMORANDUM OF DECISION AND ORDER** |
| v. | |
| ABC NISSAN, INC., et al., | |
| Defendants. | |

Pending before the Court are Motions for Summary Judgment filed by Defendant CTVT Motors, Inc. [Doc. No. 75], Defendant Automotive Investment Group-Arizona, Inc. [Doc. No. 77], and Defendant ABC Nissan, Inc. [Doc. No. 79] Plaintiff responded to the Motions for Summary Judgment [Doc. Nos. 89, 91], and Defendants replied to the Responses [Doc. Nos. 97-99].   After considering the arguments raised in the parties' briefs, the Court issues the following Memorandum of Decision and Order.   The Court makes it ruling without conducting oral argument, as oral argument would not aid the Court in its determination.

## I.  BACKGROUND

**A.  Factual Background**

Taking the facts in the light most favorable to Plaintiff, as is required for the purposes of the instant Motions for Summary Judgment, the facts are as follows.

Plaintiff Ernest "C.J." Jackson, who is African-American, was employed by Defendant ABC Nissan, Inc. ("ABC Nissan") from November 1999 until March 2001.  (Pl. Decl. ¶ 2, Pl. Dep. 47:19-22.)  He was employed by Defendant CTVT Motors, Inc. ("Camelback Toyota")

1   from March 2001 until June 2001.  (Pl. Dep. 378:7-10, 454:10-12.)[1]  Plaintiff voluntarily

2   returned to work at ABC Nissan in September 2001, and worked there for three weeks before

3   voluntarily resigning.  (Id. at 206:11-15.)  The Court now recounts the facts as they relate to

4   each period of employment.

5          1.  Plaintiff's employment with ABC Nissan: November 1999 to March 2001

6          On his application for employment with ABC Nissan, Plaintiff answered the question

7   "Have you ever been convicted of a crime in the last ten years?" negatively.  (Id. at 41:2-7.)

8   Actually, however, Plaintiff had been convicted of "false swearing," a class 6 felony, in

9   Maricopa County Superior Court in September 1997.  (Id. at 41:8-11, Ex. C to ABC Nissan's

10  SOF.)  The employment application warns that false statements or misrepresentations of facts

11  may disqualify the applicant from consideration or result in discharge. (Ex. B to ABC Nissan's

12  SOF Lederman Decl. ¶ 18.) ABC Nissan did not learn of Plaintiff's felony conviction until his

13  deposition in this matter on October 6, 2003.  (Ex. B to ABC Nissan's SOF Lederman Decl. ¶

14  17.) ABC Nissan maintains that had it known of Plaintiff's felony conviction, it would not have

15  hired him, or would have terminated his employment.  (Id. at ¶ 18.)  Plaintiff testified at his

16  deposition that he applied for the judgment against him to be vacated and dismissed, and the

17  Clerk of Court instructed him that he could answer questions about convictions negatively

18  because his conviction would be expunged from his record.  (Pl. Dep. 41:12-42:8.)  However,

19  Plaintiff has provided no evidence demonstrating that his conviction has been expunged as a

20  matter of law.

21         From November 1999 until March 2000, Plaintiff worked in new car sales at ABC

22  Nissan.  (Id. at 52:1-4.)  Initially, Plaintiff's immediate supervisor was Steve Dancy.  (Id. at

23  49:22-24.)  According to Plaintiff, Dancy called Plaintiff "boy" between 10 and 20 times.  (Id.

24  at 121:1-5, 122:13-16.)  Dancy would also comment often on where Plaintiff got his clothing

25  from, because Plaintiff wore suits to work.  (Id. at 124:17 - 125:1.)  According to Plaintiff,

26

27         [1]"Pl. Dep." refers to the deposition taken of Plaintiff in this litigation.  Plaintiff has
    testified in at least one other deposition in one other civil matter, and the Court will refer
28  separately to that testimony as needed.

1   Dancy made comments such as "Well, Black people don't really dress like this, C.J.  Where are
2   you getting your clothes from?"  (Id. at 124:15-20.)  On more than one occasion, Plaintiff
3   responded to Dancy that such comments were unacceptable, and Dancy replied that is the way
4   he speaks.  (Id. at 122:17- 123:2.)

5          Dancy's supervisor, Michael Jackson, also called Plaintiff "boy" more than ten times.
6   (Id. at 163:14-19.)  Plaintiff confronted Jackson about the use of the word "boy," but Jackson
7   continued calling Plaintiff "boy."  (Id. at 163:20-164:6.)  Plaintiff again confronted Jackson, but
8   Jackson did not cease the name-calling until Jackson eventually left ABC Nissan for unrelated
9   reasons.  (Id. at 164:7-14.)

10         In March 2000, Plaintiff moved from new car sales to the fleet department, where he was
11   a fleet manager.  (Id. at 52:13-15, 56:24.)   Though Plaintiff's title was "manager," all fleet
12   salespersons were called "managers."  (See id. at 56:23-24.)  Jerry Schwelling was the Fleet
13   Director, and Gary Green was Assistant Fleet Director.  (Id. at 56:21-24, 64:17-18.)

14         In approximately July 2000, Plaintiff's co-worker, Arlin Graff, told Plaintiff that
15   Schwelling had called Plaintiff a "nigger" when Plaintiff was not present.  (Id. at 93:8-19, Ex.
16   H to ABC Nissan's SOF.)  Plaintiff reported the incident, and John Schneider, ABC Nissan's
17   General Manager investigated the incident.  Schneider interviewed Schwelling, who denied
18   making the slur, and another fleet manager, Bob Speary, who also denied that Schwelling used
19   that language.  (Schneider Dep. 42:17-20.)  Schneider determined that Graff had fabricated the
20   incident and did not reprimand Schwelling.  (Id. at 43:10-15, 53:1-17.)  Before Schneider was
21   ABC Nissan's General Manager, Schneider was controller at ABC Nissan.  During his time as
22   controller, Schneider allegedly called an African-American woman who was a former customer
23   a "crazy nigger" and told an ABC Nissan employee that African-Americans cannot be trusted
24   and African-Americans and Mexicans bounce checks.  (Kazakevicious Dep. 31:24-32:4, 78:7-
25   17.)[2]

26

27         [2]ABC Nissan objects to the Kazakevicious deposition as inadmissible hearsay and
28   irrelevant.  ABC Nissan's objections are overruled, pursuant to FRE 801(d)(2), and because

1    On May 25, 2000, Plaintiff wrote Jerry Schwelling a letter.  In the letter, Plaintiff

2    requested he be put on the team pay plan, and further told Schwelling:

3        I must stand up and voice the facts, as I see them, of how your behavior towards
         me, and my fellow Fleet Team members has been very, very rude and
4        unprofessional.  I have been very patient with you and I have endured and
         persevered through all of your insults and off colored (nothing racial) remarks to
5        me and to my fellow team members. . . what I've experienced working under your
         leadership is totally out of line with what I'm accustomed to and what I expect
6        from a person who has your tenor in the automobile industry . . . I know that this
         organization does not plan to go into the new millennium with people like
7        yourself, who doesn't [sic] treat other people with the respect and dignity they
         deserve.

8    (Ex. I to ABC Nissan's SOF.)  Plaintiff carbon copied John Schneider, ABC Nissan's General

9    Manager, David Arnold, ABC Nissan's general sales manager, Steve Lederman, ABC Nissan's

10   controller, and Gary Green, Assistant Fleet Director for ABC Nissan.  (Id.)

11       On June 1, 2000, Plaintiff overheard David Arnold, ABC Nissan's general sales manager,

12   call two African-American customers "f--king stupid niggers."  (Id. at 130:9-23.)[3]  Arnold did

13   not realize Plaintiff was in the room until he turned around and saw Plaintiff.  (Id. at 130:25 -

14   131:3.)  Plaintiff reported the incident to Mike Banks, human resources director at ABC Nissan.

15   (Id. at 134:6-135:1, Ex. B to Pl.'s SOF at 3.)  Banks advised Plaintiff to call the employee

16   hotline, Auto HR.  (Id. at 135:2-3.)  Plaintiff also reported the incident to Gary Green, the

17   assistant fleet director, who also advised Plaintiff to call Auto HR.  (Id. at 135:24-136:8.)

18   Plaintiff then contacted Auto HR and provided details on the incident.  (Id. at 137:20-138:8.)

19   Auto HR and John Schneider investigated the incident. (Id. at 138:12-23, Schneider Decl. ¶¶

20   5, 6.)  After the investigation, Arnold spoke to Plaintiff.  Plaintiff told Arnold that Arnold could

21   not "unring the bell" and that "what's done is done."  (Pl. Dep. 147:11-13.)  Arnold had no

22   response. (Id. at 147:14-16.)

23

24

25   _____

26   Schneider's statements concerning race are relevant.

27       [3] On a number of occasions, Plaintiff had heard Arnold mocking the speech of African-
     Americans and Latinos.  (Id. at 161:9-162:6.)  However, Plaintiff did not report these incidents
28   to management.  (Id. at 162:19-163:3.)

1      When Plaintiff began working in the fleet department, he was not included on the team

2   pay plan like other fleet team members.  Under the team pay plan, team members' pay is based

3   on the performance of the entire team.  Plaintiff requested to be placed on the team plan, but

4   Schwelling declined Plaintiff's request because Plaintiff's performance was than the rest of the

5   team.  (Id. at 65:25-66:3.)  Plaintiff believed he was excluded from the team pay plan because

6   of his race.   (Id. at 66:2-7.)  After the Arnold slur incident, Arnold spoke with Plaintiff and

7   asked Plaintiff how he felt he was being treated in the fleet department.  (Id. at 147:17:21.)

8   Arnold also inquired as to Plaintiff's pay situation, and asked to see Plaintiff's numbers and said

9   he would look into the situation.  (Id. at 147:21-23.)

10      On June 6, 2000, Schneider, Schwelling, and Lederman met with Plaintiff to discuss the

11   team pay plan.  Plaintiff's "results" were "generally 30 to 50 percent less than any of the other"

12   fleet team members on the team pay plan.  (Ex. G to ABC Nissan's SOF.)  Schneider informed

13   Plaintiff that Plaintiff would benefit from other team members' higher productivity and that

14   introducing Plaintiff's numbers into the team plan would reduce other members' pay by

15   approximately 20% if Plaintiff were put on the team plan.  (Id.)  On June 7, 2000, Plaintiff opted

16   to join the team pay plan effective June 1, 2000, on the condition that Plaintiff increase his

17   production to be at least 90% of the average of the other team members' numbers by July 30,

18   2000.  (Id.)

19      On June 8, 2000, one week after the Arnold slur incident, Arnold's employment was

20   terminated.  (Schneider Decl. ¶ 8.)  Arnold testified that the incident did not come up when he

21   was terminated. (Arnold Dep. 76:16-18, 114:22-115:1.)  Schneider testified that Arnold would

22   have been fired solely on the basis of his lacking job performance, but that the slur was the

23   "icing on the cake." (Schneider Dep. 30:8-31:4.)

24      Plaintiff also felt Schwelling gave Plaintiff the worst work schedule and work

25   assignments because of his race.  Specifically, Plaintiff testified that he "would be scheduled

26   to come in, be the first one in and the last one off," and that he had more "long days" than

27   anyone else.  (Pl. Dep. 83:14-18.)  Also, Plaintiff would be sent to retrieve cars for other

28   employees from the lot in the middle of summer days.  (Id. at 84:2-21.)  However, Plaintiff

1  testified that other fleet department employees may have been assigned the same type of tasks.

2  (Id. at 84:22-85:2.)  Plaintiff confronted Schwelling about work assignments because of his

3  race, but Schwelling denied singling Plaintiff out.  (Id. at 88:15-89:4.) Plaintiff also called the

4  Auto HR hotline in December 2000 to report that he was unfairly written up and not given

5  permission to swap work days with one of his co-workers. (Schneider Decl. ¶ 8.) Race was not

6  mentioned in Plaintiff's complaint to Auto HR.  (Id.)  John Schneider investigated the complaint

7  and determined that the complaint lacked merit.  (Id.)

8       In addition, Plaintiff overheard Schwelling and Plaintiff's Australian co-worker, Matt

9  Nazar, discussing "what they call Black people in Australia." (Pl. Dep. 67:23-68:7.) Nazar said

10  that black people are called "porch monkeys" and Schwelling repeated the term. (Id. at 68:4-6.)

11  Schwelling also said African-Americans are called "sugar babies" and "coons" in the United

12  States.  (Id. at 68:6-12.) Schwelling and Nazar were in the same open area as Plaintiff and saw

13  Plaintiff.  (Id. at 99:1-20.)  After the incident, Plaintiff confronted Nazar and told Nazar it was

14  offensive and that Plaintiff "didn't appreciate the conversation that [he] overheard."  (Id. at

15  100:15-101:18.) Nazar responded sarcastically and Plaintiff then walked away.  (Id. at 101:18-

16  20.)  Plaintiff did not confront Schwelling about the incident, and he did not report it to an ABC

17  Nissan supervisor.  (Id. at 101:21-102:13.)

18       Schwelling also referred to Asian customers as "too-highs," and he called another

19  employee, Gabriel Santana, a "wetback" and a "dumb Mexican."  (Pl. Dep. 69:19-71:6, 73:11-

20  15, 77:13-15.)  Plaintiff complained to John Schneider and called Auto HR about Schwelling's

21  "too-highs" comments.  (Id. at 71:21-72:19.)  According to Plaintiff, he complained to John

22  Schneider approximately three or four times about his derogatory comments about other

23  minority groups, including Asians, Mexicans, and Native Americans.  (Id. at 103:11-104:10.)

24  Plaintiff also confronted Schwelling about his use of the term "too-highs" and his references to

25  Santana as a "wetback."  (Id. at 70:3-23, 76:4-22.)  A co-worker of Plaintiff's, Elite Trice, also

26  testified that he heard Schwelling use the terms "wetback," "camel jockey," "kike," and "stupid

27

28

1  Mexican."  (Ex. D to Pl.'s SOF in Opp. to ABC Nissan and Camelback Toyota's Mots. Trice

2  Dep. 12:16-13:20.)[4]

3          In addition, Gary Green, the assistant fleet director, called customers of Mexican descent

4  "wetbacks" and "mojados" and he would also customers of Asian descent "too-highs." (Pl. Dep.

5  at 127:2-15.)  Green would also mock the way Asian customers spoke.  (Id. at 126:22-24.)

6  Green did not engage in slurs directed at African-Americans or at Plaintiff.  (Id. at 127:22-24,

7  129:5-10.)  Plaintiff confronted Green about these incidents, but Green did not respond.  (Id.

8  at 128:3-9.)  Plaintiff does not recall whether he called the employee hotline about Green.  (Id.

9  at 128:20-22.)

10          Also in 2000, Plaintiff's co-workers in the fleet department engaged in racial slurs.  Matt

11  Nazar referred to co-worker Gabriel Santana as a "dumb Mexican," "stupid Mexican," and a

12  "wetback." (Id. at 166:2-8.)  Nazar would also tell Santana, "You need to go back home, south

13  of the border."  (Id. at 166:9-10.)  Nazar called customers of Asian descent "too-highs" and

14  African-American customers "thugs."  (Id. at 167:9-11, 168:2-12.)  Plaintiff did not report these

15  incidents to management. (Id. at 168:18-25.) In addition to Nazar, co-worker Todd Greenberg

16  joked  about "wetbacks," "mojados," "too-highs," "Japs," and "spics."  (Id. at 171:13-23.)

17  Greenberg also asked Plaintiff the meaning of a saying involving "niggers and flies," to which

18  Plaintiff responded he did not want to discuss it and it was not appreciated in the workplace.

19  (Id. at 170:7-15.)  Plaintiff did not report Greenberg's comments to management.  (Id. at 171:24-

20  172:3.)

21          Beginning in December 2000, Plaintiff approached John Schneider about transferring

22  to a different dealership to be in a different environment.  (Id. at 175:9-176:4, 376:3-21.)  In

23  March 2001, Plaintiff transferred from ABC Nissan to Camelback Toyota.  (Id. at 47:23 - 48:1.)

24  //

25  //

26

27  _____

28      [4]ABC Nissan objects to this deposition for the same reasons as the Kazakevicious
    deposition.  For the reasons stated in footnote 2 *supra*, the Court overrules those objections.

<u>2.  Plaintiff's employment with Camelback Toyota: March 2001 to June 2001</u>

Plaintiff joined Camelback Toyota as a fleet internet salesperson.[5]  (<u>Id.</u> at 385:3-5, 386:7-9.)  Plaintiff's direct supervisor, and the person who facilitated his transfer from ABC Nissan to Camelback Toyota, was Tommy Oh.  (<u>Id.</u> at 176:15-25, 177:17-21.)  Oh is Asian-American.  (<u>Id.</u> at 392:2-3.)

During his employment with Camelback Toyota, Plaintiff "believe[s]" that minority customers were given higher interest rates on vehicle purchases than non-minority customers.  (Pl. Decl. ¶ 52, Pl. Dep. 402:1-20.)  Plaintiff complained about this treatment to Oh, who informed him that it was the way business was done because Oh wanted Plaintiff to make as much gross profit on the sale as possible.  (<u>Id.</u> at 402:23-403:2, 406:18-407:8.)  Oh did not use any racial slurs during conversations regarding interest rates with Plaintiff.  (<u>Id.</u> at 411:2-4.)

According to Plaintiff, Oh used racial slurs such as "too-highs," "wetback," and "Jewing down the price" about customers.  (<u>Id.</u> at 442:8-443:1.)  Plaintiff confronted Oh about his use of those slurs "many" times; it is unclear from the record whether Oh responded.  (<u>Id.</u> at 443:2-15.)  Plaintiff did not report Oh's comments to management.  (<u>Id.</u> at 447:7-18, 449:9-12.)  Furthermore, Plaintiff testified that he is not alleging in this lawsuit that Oh did anything to subject Plaintiff to racial harassment.  (<u>Id.</u> at 393:16-18.)

In addition to Oh, Plaintiff testified that numerous co-workers used racial slurs.  At no time, however, did anyone at Camelback Toyota make any racial comments towards Plaintiff (<u>Id.</u> at 429:20-430:16) or about any co-workers (<u>Id.</u> at 430:17-431:5).  Co-workers' racial comments were about customers, and the slurs used were "wetbacks," "Mexicans having mattress money," "too-high," and "Jewing down."  (<u>Id.</u> at 439:3, 16-18, 22-24.)  Plaintiff cannot identify the names of any of the co-workers who used those terms, however.  (<u>Id.</u> at 439:25-440:6.)  Plaintiff confronted them on "a couple of occasions," but did not report the incidents to Camelback Toyota management.  (<u>Id.</u> at 441:4-442:8.)

_____

[5]At his deposition, Plaintiff could not recall his exact title.  (<u>See</u> <u>id.</u> at 385:3-5.)

1         Plaintiff also testified that John O'Malley, Camelback Toyota's general manager, once

2    "yelled at" Plaintiff for spending too much time with a customer who was a friend of Plaintiff's.

3    (Id. at 397:22-25.)   The customer was African-American. (Id. at 394:1-3.)   According to

4    Plaintiff, O'Malley told Plaintiff "we're not here to socialize, we're here to take care of

5    business," and Plaintiff thought O'Malley was "rude" to him. (Id. at 398:2-7.)  No references to

6    race were made during the conversation.  (Id. at 399:9-11.)

7         After working for Camelback Toyota for 90 days, Plaintiff voluntarily resigned from

8    employment in June 2001.   (Id. at 48:16-18, 454:10-12.)   Plaintiff left Camelback Toyota

9    because he sought more money, a better way to care for his family, a better lifestyle, and

10   because he received "a better job offer." (Id. at 189:22-190:7, Pl. Dep. in Torres v. ABC Nissan

11   7:23-8:3.)  Plaintiff's departure from Camelback Toyota was in part due to his "90-day plan,"

12   whereby Plaintiff would review his financial situation every 90 days and decide what he was

13   going to do the next quarter.  (Pl. Dep. at 190:8-18, Pl. Trial Testimony in Torres v. ABC

14   Nissan 11:7-17.)  Plaintiff would "set goals every 90 days," and if he was not reaching those

15   goals, he "would go ahead and go to a different job."  (Pl. Trial Testimony in Torres v. ABC

16   Nissan 11:15-17.)  Plaintiff also testified at his deposition in this case that he left Camelback

17   Toyota in part because he "was tired of the working environment."  (Pl. Dep. 460:16-17.)

18        Plaintiff left Camelback Toyota in June 2001.   (Id. at 470:15-18.)   Following his

19   employment with Camelback Toyota, Plaintiff referred family members, who are African-

20   American, to Oh and other former co-worker Sam Sanchez.  (Id. at 530:16-531:21.)  Plaintiff

21   worked at two subsequent jobs after leaving Camelback Toyota.  Plaintiff first worked at Fifth

22   Third Bank for 90 days, and then began working for Heartland Home Finance in August 2001.

23   (Id. at 191:19-193:2.)  Plaintiff left Fifth Third because he wanted to earn more money, have

24   a better lifestyle, and better care for his family.  (Id. at 193:13-20.)

25        Plaintiff called ABC Nissan about returning to work there, and spoke with the new fleet

26   director Bill Brixey.  (Id. at 195:19-196:4.)  Plaintiff asked Brixey if things had changed at ABC

27   Nissan, and Brixey told him that Schwelling and Arnold were no longer there, so things had

28   indeed changed.  (Id. at 197:2-9.)  Plaintiff said he would return to work there if his terms were

1   met.  (Id. at 197:10-11.)  Specifically, Plaintiff wanted afternoons and weekends off.  (Id. at
2   197:19-21.)  John Schneider agreed to those terms, and Plaintiff agreed to return to ABC
3   Nissan.  (Id. at 197:15-18.)  Plaintiff also testified that he returned to work there because he
4   "needed the extra income."  (Id. at 198:4-6.)

5        Plaintiff was still employed by Heartland Home Finance when he returned to ABC
6   Nissan in September 2001.  (Id. at 203:8-204:20.)  Ultimately, Plaintiff resigned from Heartland
7   Home Finance because of a dispute over how much commission Plaintiff earned.  (Id. at 194:19-
8   195:8.)

9        3.  Plaintiff's second employment with ABC Nissan: September 2001 to October 2001
10       While at ABC Nissan the second time, Plaintiff worked again as a fleet manager.  (Id. at
11   202:16-18.)  Plaintiff's supervisor was Bill Brixey, who did not subject Plaintiff to racial
12   harassment.   (Id. at 202:2-24, 206:23-207:2.)  Plaintiff testified at his deposition that the
13   assistant fleet director was possibly Matt Nazar, and Plaintiff "heard Matt" make racially
14   derogatory comments. (Id. at 208:1-16.)  Plaintiff did not specify which comments Nazar
15   allegedly made.  (Id.)  However, Nazar did not work for ABC Nissan when Plaintiff returned
16   in September 2001; Nazar had left ABC Nissan in July 2001.  (Lederman Decl. ¶ 12.)  Aside
17   from Nazar, Plaintiff stated that "supervisors, ASMs [assistant sales managers], managers" made
18   comments.  (Pl. Dep. 208:4-13.)  With regard to those supervisors, though, Plaintiff did not
19   provide specific details as to who made such comments or what comments were made.

20       Plaintiff, however, testified that co-workers used racial slurs.  Nathan Long called
21   customers such names as "too-highs" and "spics."  (Id. at 211:18-212:9.)  Plaintiff confronted
22   Long, but Long did not stop making the comments.  (Id. at 212:15-213:13.)  Plaintiff did not
23   report those incidents to management, because he had put in complaints during his first period
24   of employment to no avail.  (Id. at 212:10-13, 213:25-214:11.)  Co-worker Brian Stokes also
25   commented that Mexican customers had credit problems and they could not understand Stokes
26   because of a language barrier.  (Id. at 215:10-22.)  Plaintiff did not report Stokes' statements to
27   management.  (Id. at 218:11-13.)  Also, ABC Nissan's finance director Greg Walders used the
28   slur "wetback" to describe customers and co-workers of Mexican descent and commented on

1  their credit problems and "mattress money."  (Id. at 216:10-217:5.)  Plaintiff did not report
2  Walders' comments to management.  (Id. at 218:18-21.)

3       Plaintiff decided to resign because the environment had not changed.  (Id. at 213:3-11.)
4  Plaintiff worked at ABC Nissan for three weeks, from September until October 2001, before
5  voluntarily resigning.  (Id. at 206:11-15.)

6            The entities involved in this case

7       Prior to March 1999, ABC Nissan, Inc. was known as Automotive Investment Group,
8  Inc., or "AIG, Inc."  (Ex. 2 to Pl.'s SOF in Opp. to AIG-AZ's Mot.)  Automotive Investment
9  Group-Arizona, Inc., or "AIG-AZ," is an auto dealership management consulting company that
10 was incorporated in 1998 and contracts with both ABC Nissan and Camelback Toyota to
11 provide consulting services.  (Id., Exs. B-1 and B-2 to AIG-AZ's Mot.)

12 **B.  Procedural Background**

13      Plaintiff filed a Complaint against Defendants in this Court on March 25, 2003. [Doc.
14 No. 1] Plaintiff filed an Amended Complaint in March 2004 [Doc. Nos. 49, 50], and that
15 Amended Complaint was stricken by Order filed December 17, 2004. [Doc. No. 63]  Plaintiff
16 filed a Second Amended Complaint on January 18, 2005, alleging two counts: hostile work
17 environment and constructive discharge in violation of 42 U.S.C. § 1981. [Doc. No. 65]

18      On September 30, 2005, ABC Nissan, Camelback Toyota, and AIG-AZ each filed
19 separate Motions for Summary Judgment. [Doc. Nos. 75, 77, 79] Plaintiff responded jointly to
20 ABC Nissan and Camelback Toyota's Motions and also to AIG-AZ's Motion on November 18,
21 2005 [Doc. Nos. 89, 91], and each Defendant replied separately on December 5, 2005. [Doc.
22 Nos. 97, 98, 99] ABC Nissan and AIG-AZ also filed Objections to Plaintiff's Statement of Facts
23 on December 5, 2005. [Doc. Nos. 100, 101]

24      This matter was previously assigned to the Honorable Earl H. Carroll, who recused from
25 further participation in this action on January 5, 2006. [Doc. No. 102]

26      The Court's exercise of jurisdiction over this case is proper under 28 U.S.C. § 1331,
27 because the matter in controversy arises under the laws of the United States.  Venue is proper
28 pursuant to 28 U.S.C. § 1391(b).

## II.  MOTIONS FOR SUMMARY JUDGMENT

### A.  Standard of Review

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994).  Substantive law determines which facts are material.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also Jesinger, 24 F.3d at 1130.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.  The dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Id.; see Jesinger, 24 F.3d at 1130.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex, 477 U.S. at 323-24.  Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994).  The moving party need not disprove matters on which the opponent has the burden of proof at trial.  See Celotex, 477 U.S. at 323-24.  The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); see Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 585-88 (1986); Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995).

### B.  Discussion:  ABC Nissan and Camelback Toyota's Motions for Summary Judgment

The Court addresses Plaintiff's two claims in turn. For each claim, the Court considers each period of Plaintiff's employment separately: first, Plaintiff's period of employment with

1   ABC Nissan; second, Plaintiff's employment with Camelback Toyota; and third, Plaintiff's
2   second period of employment with ABC Nissan.

3       1.  Hostile Work Environment

4       To establish a hostile work environment under 42 U.S.C. § 1981 or Title VII, Plaintiff
5   must demonstrate that (1) he was subjected to verbal or physical conduct based on his race; (2)
6   the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter
7   the conditions of his employment and create an abusive work environment.  Manatt v. Bank of
8   Am., N.A., 339 F.3d 792, 797-98 (9th Cir. 2003).

9       Plaintiff must therefore show that the workplace was both objectively and subjectively
10  hostile.  Nichols v. Azteca Rest. Enters., 256 F.3d 864, 871-72 (9th Cir. 2001).  In determining
11  whether a work environment is objectively hostile, courts look at "all the circumstances" and
12  consider such factors as "frequency of the discriminatory conduct; its severity; whether it is
13  physically threatening or humiliating, or a mere offensive utterance; and whether it
14  unreasonably interferes with an employee's work performance."  Harris v. Forklift Systems,
15  Inc., 510 U.S. 17, 23 (1993).  "The required level of severity or seriousness varies inversely
16  with the pervasiveness or frequency of the conduct."  Nichols, 256 F.3d at 872 (internal
17  quotation marks and citation omitted).  Also, because "allegations of a racially hostile
18  workplace must be assessed from the perspective of a reasonable person belonging to the racial
19  or ethnic group of the plaintiff," the Court considers whether Plaintiff's workplace was hostile
20  from the perspective of the reasonable African-American.  McGinest v. GTE Serv. Corp., 360
21  F.3d 1103, 1115 (9th Cir. 2004).

22      Against this backdrop, the Court now considers each of Plaintiff's periods of
23  employment.

24          a.  ABC Nissan: First period of employment

25      Mindful of the need to consider the "all of the circumstances," Harris, 510 U.S. at 23, the
26  Court nonetheless finds it helpful to first separately discuss two categories of the alleged
27  harassment: harassment by supervisors and harassment by co-workers.  This distinction is

28

1  crucial, as "[a]n employer's liability for harassing conduct is evaluated differently when the

2  harasser is a supervisor as opposed to a coworker." McGinest, 360 F.3d at 1119.

3                                    i. Supervisors as harassers

4        "An employer is vicariously liable for a hostile work environment created by a

5  supervisor, although such liability is subject to an affirmative defense." Id.  Although ABC

6  Nissan urges this Court to look primarily at whether the incidents were reported to management

7  or the employee hotline [Doc. No. 79 at 8], the Court must focus on "whether the harasser has

8  immediate or successively higher authority over the victim of the harassment, not on whether

9  the employer knew of the harassment." Burrell v. Star Nursery, Inc., 170 F.3d 951, 956 (9th

10 Cir. 1999).  Therefore, "if the harassment is actionable and the harasser has supervisory

11 authority over the victim," the Court will presume an employer's vicarious liability for the

12 harassment. Id.  That presumption can only be overcome if no tangible employment action was

13 taken, and if a two-prong affirmative defense established by the Supreme Court in Burlington

14 Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 755

15 (1998)[6] can be shown by the employer.  Id.

16       Accordingly, the Court will first determine whether the harassment is actionable and

17 whether the harasser has supervisory authority over the victim.  The Court considers separate

18 incidents of harassment in turn.

19                               A. Supervisors calling Plaintiff "boy"

20       According to Plaintiff, his direct supervisor in the new car sales department, Steve

21 Dancy, and Dancy's supervisor, Michael Jackson, each referred to Plaintiff as "boy" more than

22 ten times.  Plaintiff reports confronting both Dancy and Jackson about those comments, but

23 neither one stopped using the term.

24       In Ash v. Tyson Foods, Inc., the Supreme Court noted that use of the word "boy,"

25 without any racial modification such as "black" or "white," may be evidence of racial animus.

26

27 ────────────────

28        [6]The affirmative defense is commonly known as the "Ellerth/Faragher defense." See,
   e.g., Pennsylvania State Police v. Suders, 542 U.S. 129, 140 (2004).

126 S.Ct. 1195, 1197 (2006) (per curiam).  Whether the term evidences racial animus depends on "various factors including context, inflection, tone of voice, local custom, and historical usage."  Id.

Here, taking the facts in the light most favorable to Plaintiff, the Court concludes that a jury could find the use of "boy" as evidence of discrimination.  The context in which the comments were made is a workplace in which racial slurs about various minorities were made on a regular basis, according to Plaintiff.  In addition, Dancy often commented to Plaintiff about Plaintiff's dress and questioned where Plaintiff, an African-American, would get his suits.  Also, Plaintiff specifically confronted both Dancy and Jackson about the use of the term "boy" and how it was disrespectful, but neither of them ceased their use of the term.  Taken in that context, "boy" could be considered evidence of discrimination by a reasonable jury.  See id.  In addition, both Dancy and Jackson had supervisory authority over Plaintiff.  Thus, a presumption of ABC Nissan's vicarious liability for these episodes arises.  See Burrell, 170 F.3d at 956.  That presumption can be overcome only if no tangible employment action was taken and ABC Nissan can establish a two-part affirmative defense.

A tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different duties, or a decision causing a significant change in benefits."  Ellerth, 524 U.S. at 761.  A constructive discharge precipitated by a supervisor's "official act" may qualify as a tangible employment action.  Pennsylvania State Police v. Suders, 542 U.S. 129, 140-41 (2004).  For reasons described in Section II.2.A, infra, the Court concludes that a genuine issue of material fact exists as to Plaintiff's constructive discharge claim.  Thus, the Court will not consider an affirmative defense by ABC Nissan, as it is not available to ABC Nissan if Plaintiff can prove constructive discharge.

> B.  Manager calling African-American customers "niggers" and
> Plaintiff's supervisor calling Plaintiff "nigger"

On one occasion, ABC Nissan's general sales manager, David Arnold, called African-American customers "niggers" in Plaintiff's presence.  Arnold, however, did not know Plaintiff

1   was in the room, and Arnold was terminated a week later.  On another occasion, Plaintiff's

2   supervisor, Jerry Schwelling, called Plaintiff a "nigger" to another employee.  Plaintiff was not

3   present during that incident.  John Schneider, ABC Nissan's general manager, investigated the

4   Schwelling incident and determined it was fabricated because Schwelling and another witness

5   denied it occurred.  However, there is also testimony that Schneider himself has used the racial

6   slur "nigger" in the past.

7          "It is beyond question that the use of the word 'nigger' is highly offensive and demeaning,

8   evoking a history of racial violence, brutality, and subordination.  This word is 'perhaps the most

9   offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and

10  bigotry." McGinest, 360 F.3d at 1116 (quoting Swinton v. Potomac Corp., 270 F.3d 794, 817

11  (9th Cir. 2001)).  Indeed, "[p]erhaps no single act can more quickly alter the conditions of

12  employment and create an abusive working environment than the use of an unambiguously

13  racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." Id. (quoting

14  Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993)).  A presumption

15  of liability therefore arises because Arnold held a supervisory position and his conduct is

16  actionable. See Burrell, 170 F.3d at 956.  Because the Court finds an issue of fact exists as to

17  whether a constructive discharge for this period of Plaintiff's employment occurred, the

18  Ellerth/Faragher defense is not available to ABC Nissan.

19         In addition to the Arnold incident is Schwelling's use of the slur.  Taking the facts in the

20  light most favorable to Plaintiff, Schwelling called Plaintiff a "nigger" and the person assigned

21  to investigate the incident has also used that slur.  That incident, taken in conjunction with other

22  slurs used by Schwelling about African-Americans in Plaintiff's presence such as "coon," "sugar

23  babies," and "porch monkey," could be found by a reasonable jury to evidence racial hostility

24  in the workplace.  Because Schwelling was in a supervisory position over Plaintiff and the

25  conduct could be found actionable by a jury, the presumption of liability arises. See id.  For

26

27

28

1   reasons stated, *supra*, the affirmative defense is not available to ABC Nissan because a genuine

2   issue of material fact as to whether a constructive discharge occurred in this case.[7]

3                          C. Managers using slurs about other racial groups

4        According to Plaintiff, two ABC Nissan managers used slurs about racial groups other

5   than African-Americans in the workplace. First, Jerry Schwelling referred to customers of

6   Asian descent as "too-highs" and called another employee, Gabriel Santana, a "wetback" and

7   a "dumb Mexican." Plaintiff confronted Schwelling and reported the "too-highs" remarks to

8   Schneider.[8] Another employee, Elite Trice, also testified that he heard Schwelling use the terms

9   "wetback," "camel jockey," "kike," and "stupid Mexican." In addition, Gary Green, the assistant

10  fleet director, called customers of Mexican descent "wetbacks" and "mojados," and customers

11  of Asian descent "too-highs." Green also mocked the way Asian customers spoke. Plaintiff

12  confronted Green about these incidents, but Green did not respond.

13       ABC Nissan contends that Plaintiff may not base his hostile work environment on

14  Schwelling and Green's comments about other racial groups. [Doc. No. 79 at 10.] ABC Nissan,

15  however, does not cite any Ninth Circuit law for its contention. The Court notes the Ninth

16  Circuit's observation in <u>McGinest</u> that "if racial hostility pervades a workplace, a plaintiff may

17  establish a violation of Title VII, even if such hostility was not directly targeted at plaintiff."[9]

18  ─────────────────

19       [7]The Court notes that Plaintiff also testified that he was given different work assignments
20  and work schedule because of his race. However, Plaintiff did not mention race in his
    complaint to management and details on what precisely the complaint entailed are sparse; it
21  appears from the record the complaint to the hotline was only about an inability to swap
    workdays, and it is not apparent that a general scheduling/work assignment problem was
22  reported.

23       [8]ABC Nissan notes the letter Plaintiff sent Schwelling that stated "I have endured and
24  persevered through all of your insults and off colored (*nothing racial*) remarks to me and to my
    fellow team members" (Ex. I to ABC Nissan's SOF) (emphasis added). Although Plaintiff
25  stated that Schwelling had said "nothing racial," the Court notes that the date of the letter was
    May 25, 2000, before the incident reported by Graff, and months before Plaintiff left ABC
26  Nissan.

27       [9]The legal principles guiding a court's analysis of a Title VII claim "apply with equal
28  force in a § 1981 action." <u>Manatt</u>, 339 F.3d at 797.

                                         - 17 -

1   360 F.3d at 1117; see also Woods v. Graphic Communications, 925 F.2d 1195, 1202 (9th Cir.

2   1991) (holding that work environment was racially hostile when plaintiff "was surrounded by

3   racial hostility, and subjected directly to some of it."). The Court concludes that Schwelling and

4   Green's comments about other racial groups, when viewed cumulatively with other instances

5   of racial slurs in Plaintiff's first period of employment with ABC Nissan, raise an issue of triable

6   fact as to a hostile work environment. Because Schwelling and Green were Plaintiff's

7   supervisors and their conduct may be actionable, the presumption of liability arises. See

8   Burrell, 170 F.3d at 956. The two-part affirmative defense is not available to ABC Nissan

9   because there is also an issue of triable fact as to whether a constructive discharge, or tangible

10  employment action, took place.

11                     ii.  Co-workers using slurs about other racial groups

12          The Court now considers the use of racial slurs by Plaintiff's co-workers, rather than

13  Plaintiff's supervisors. Plaintiff testified that co-workers Nazar and Greenberg used racial slurs;

14  however, Plaintiff did not report any of those incidents to ABC Nissan management. "If . . . the

15  harasser is merely a co-worker, the plaintiff must prove that . . . the employer knew or should

16  have known of the harassment but did not take adequate steps to address it." McGinest, 360

17  F.3d at 1119 (quoting Swinton, 270 F.3d at 803) (first ellipsis added, second ellipsis in original).

18  Plaintiff has not demonstrated that ABC Nissan management had notice of these incidents.

19  Thus, the Court concludes that these incidents cannot be considered in Plaintiff's hostile work

20  environment claim.

21                     iii.  Conclusion as to ABC Nissan: first period of employment

22          The Court concludes that the acts by ABC Nissan supervisors, taken cumulatively,

23  constitute a hostile working environment for the reasonable African-American. The Court must

24  now, however, look at whether the workplace was subjectively hostile. That is, Plaintiff must

25  also have perceived his workplace to be racially hostile.

26          ABC Nissan emphasizes the fact that Plaintiff voluntarily returned to work at ABC

27  Nissan within approximately six months to work at ABC Nissan. The Ninth Circuit has alluded

28  that a plaintiff's voluntary return to the supposedly hostile environment may call subjective

1   hostility into question.  See Manatt, 339 F.3d at 799, n. 6 ("In considering whether [plaintiff]

2   subjectively perceived her work environment as abusive, we think that [her] efforts to return to

3   [hostile workplace] are relevant."); see also French v. Eagle Nursing Home, Inc., 973 F.Supp.

4   870, 877-78 (D. Minn. 1997) ("The only logical conclusion that the Court can draw from

5   [plaintiff's] wish to return to [employer] is that the working conditions there were in fact not

6   intolerable.").  However, the Court notes that Plaintiff complained of racial slurs twice through

7   the employer's official channels, and repeatedly confronted supervisors and co-workers about

8   their offensive language.  Taking the facts in the light most favorable to Plaintiff, the Court

9   concludes that Plaintiff's complaints sufficiently show that he perceived his workplace to be

10  hostile.  The Court further notes that Plaintiff returned to ABC Nissan upon assurances that the

11  environment had changed because Arnold and Schwelling were no longer at ABC Nissan.

12  Therefore, the Court will deny ABC Nissan's Motion for Summary Judgment as to hostile work

13  environment during Plaintiff's first period of employment.

14              b.  Camelback Toyota

15              The Court considers first whether Plaintiff's work environment at Camelback Toyota was

16  objectively hostile.  Then, the Court looks at whether the work environment was perceived by

17  Plaintiff to be hostile.

18              At the outset, the Court notes that Plaintiff has failed to respond to the vast majority of

19  the arguments presented in Camelback Toyota's Motion for Summary Judgment.  Plaintiff

20  testified at deposition as to certain conduct that he alleges occurred at Camelback Toyota, yet

21  does not mention any of those Camelback Toyota-specific events or cite a single case

22  supporting opposition to summary judgment with respect to those events. Plaintiff's complete

23  lack of response to Camelback Toyota's arguments regarding the disparity in interest rates

24  offered to minority customers, and lack of evidence to support the interest rate allegation, is

25  fatal to his hostile work environment claim to the extent that his claim is based on interest rate

26  disparities.  See Celotex, 477 U.S. at 322-24.  It is not the Court's duty to make Plaintiff's

27  arguments for him, and the Court is unaware of case law that supports the proposition that a

28

1   plaintiff's "belief"[10] that minority third parties (who are not co-workers) were treated differently

2   than non-minority third parties demonstrates the elements required for a hostile work

3   environment claim.  See Manatt, 339 F.3d at 797-98 (listing the elements of a hostile work

4   environment claim:  (1) plaintiff was subjected to verbal or physical conduct based on his race;

5   (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter

6   the conditions of his employment and create an abusive work environment).  At most, a claim

7   regarding treatment of third parties may show some racial hostility in the workplace.  See

8   McGinest, 360 F.3d at 1117 ("if racial hostility pervades a workplace, a plaintiff may establish

9   a violation of Title VII, even if such hostility was not directly targeted at plaintiff").  However,

10  Plaintiff has not provided the Court with any evidence of such treatment; Plaintiff has merely

11  expressed his "belief" that such conduct occurred.  While Plaintiff's "belief" may be sufficient

12  at the pleading stage, it is wholly insufficient at the summary judgment stage.  See Celotex, 477

13  U.S. at 322-24.  Thus, because conclusory allegations and unsupported contentions are

14  insufficient at the summary judgment stage, the Court therefore cannot conclude that a hostile

15  work environment existed with regard to these alleged practices.

16          Plaintiff also alleges that John O'Malley, Camelback Toyota's general manager, was

17  "rude" to him when O'Malley admonished Plaintiff for apparently spending too much time with

18  an African-American customer who was a friend of Plaintiff's.  O'Malley told Plaintiff "we're

19  not here to socialize."  However, offhand comments and isolated incidents (unless extremely

20  serious) will not amount to a discriminatory change in the terms and conditions of employment.

21  Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001). O'Malley also made no mention

22  of race. Even if the Court were to assume O'Malley made his remark because of race, the remark

23  was, at most, an isolated, offhand comment that is not "extremely serious" under controlling

24  case law.  See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998); see also Brooks v.

25  _____

26          [10]In his Statement of Facts in opposition to Camelback Toyota's Motion, Plaintiff states
27  that he "believed that Camelback Toyota employees" based interest rates on minority status.
    (Pl.'s SOF ¶ 52) (emphasis added).  Plaintiff has provided no evidence showing that interest
28  rates varied based on a customer's race, however.

1    City of San Mateo, 229 F.3d 917, 925-26 (9th Cir. 2000).  The remark is therefore not

2    actionable.

3         Furthermore, even if Plaintiff's allegations regarding treatment of customers were taken

4    into account with the remainder of Plaintiff's statements about racial comments by fellow

5    Camelback Toyota employees, Plaintiff has not established a hostile work environment claim.

6    The Court first addresses Plaintiff's allegations about the use of slurs by his supervisor, Tommy

7    Oh.  The Court will then consider Plaintiff's allegations regarding co-workers.

8         Plaintiff testified at his deposition that his direct supervisor, Tommy Oh, an Asian-

9    American, used racial slurs about customers of Asian, Mexican, and Jewish descent.  For an

10   employer to be liable for the actions of a supervisor, the harassing conduct must be actionable.

11   Burrell, 170 F.3d at 956.  The Court concludes that those comments do not constitute a hostile

12   work environment.  Although racial hostility need not be directly targeted at Plaintiff to

13   establish a hostile work environment claim, Plaintiff has not provided sufficient evidence that

14   "racial hostility pervade[d] [his] workplace."  See McGinest, 360 F.3d at 1117.  Thus, Oh's

15   comments are not actionable and Camelback Toyota cannot be liable for the alleged harassment.

16   Furthermore, the Court notes Plaintiff's own testimony that he does not allege in this lawsuit that

17   Oh did anything to subject Plaintiff to racial harassment.  (Pl. Dep. 393:16-18.)

18        Regarding the alleged comments by co-workers about minority customers, the Court

19   notes that Plaintiff has failed to provide any specific information as to which co-workers made

20   comments.  Additionally, Plaintiff did not report any racial comments by his co-workers to

21   Camelback Toyota management.  As the Court has iterated supra, "[i]f . . . the harasser is

22   merely a co-worker, the plaintiff must prove that . . . the employer knew or should have known

23   of the harassment but did not take adequate steps to address it."  McGinest, 360 F.3d at 1119

24   (quoting Swinton, 270 F.3d at 803) (first ellipsis added, second ellipsis in original).  Because

25   Plaintiff has not demonstrated that Camelback Toyota management had notice of these

26   incidents, the Court will not consider them in Plaintiff's hostile work environment claim.

27        Therefore, because Plaintiff has failed to show that an objectively hostile work

28   environment exists, even when the facts are taken in the light most favorable to him and all the

1   circumstances are considered, the Court need not address subjective hostility and will grant

2   Camelback Toyota's Motion for Summary Judgment as to hostile work environment.  See

3   Celotex, 477 U.S. at 322.[11]

4                    c. ABC Nissan: Second period of employment

5          First, the Court considers whether Plaintiff's work environment was objectively hostile.

6   During Plaintiff's second period of employment with ABC Nissan, Plaintiff alleges that

7   comments were made by co-workers and supervisors about other racial groups.  However,

8   Plaintiff provides no information specifying which supervisor made racially derogatory

9   statements, or identifying precisely what was said.  At the summary judgment stage, Plaintiff

10  must proffer more than conclusory statements.  Thus, the Court will not consider remarks made

11  by supervisors during Plaintiff's second period of employment with ABC Nissan.

12         Plaintiff furnishes details on comments by co-workers; however, Plaintiff did not report

13  any of those incidents to ABC management.[12]  When the harasser is a co-worker, a "plaintiff

14  must prove that . . . the employer knew or should have known of the harassment but did not take

15  adequate steps to address it."  McGinest, 360 F.3d at 1119 (quoting Swinton, 270 F.3d at 803)

16  (ellipsis in original).  Here, Plaintiff has not shown that ABC Nissan had notice of those

17  instances of harassment.  Because Plaintiff as failed to demonstrate the workplace was

18  objectively hostile, the Court need not reach the issue of subjective hostility, and summary

19  judgment as to hostile work environment during Plaintiff's second period of employment with

20  ABC Nissan is appropriate.  See id.

21  //

22  //

23

24         [11]For reasons stated in footnote 18, *infra*, the Court rejects any claim by Plaintiff that
     Camelback Toyota is liable for the acts of ABC Nissan.

25
26         [12]Apparently, one of the harassers was "finance director" for ABC Nissan.  Even if the
     finance director is a supervisor, Plaintiff has not shown that he had "immediate (or successively
27  higher) authority over" Plaintiff as required for employer liability.  McGinest, 360 F.3d at 1119
     n.13 (quoting Faragher, 524 U.S. at 806).  That is, Plaintiff has not demonstrated that the
28  finance director "has the authority to demand obedience from" Plaintiff.  Id.

1    2.  Constructive Discharge

2        A constructive discharge occurs when an employee is forced to quit because of

3    intolerable and discriminatory working conditions.  See Schindrig v. Columbia Mach., Inc., 80

4    F.3d 1406, 1411 (9th Cir. 1996) (citation omitted).  The Court's constructive discharge inquiry

5    "is objective: Did working conditions become so intolerable that a reasonable person in the

6    employee's position would have felt compelled to resign?"  Suders, 542 U.S. at 141.  Normally,

7    whether working conditions are so intolerable and discriminatory as to compel an employee to

8    resign in a question left to a jury; however, a plaintiff "must show some aggravating factors,

9    such as a continuous pattern of discriminatory treatment" to establish a constructive discharge

10   claim.  Schindrig, 80 F.3d at 1411-12.  "Summary judgment is therefore appropriate on a

11   constructive discharge claim where the decision to resign was unreasonable as a matter of law."

12   Lawson v. Washington, 296 F.3d 799, 805 (9th Cir. 2002).

13        The Court now applies this legal standard to each of Plaintiff's periods of employment.

14              a.  ABC Nissan: First period of employment

15        In this case, Plaintiff transferred from ABC Nissan to Camelback Toyota.  Assuming

16   that a transfer to a new work location is the equivalent of a resignation,[13] the Court considers

17   the facts surrounding Plaintiff's departure from ABC Nissan after his first period of

18   employment.

19        In an unrelated civil matter, Plaintiff provided sworn testimony regarding the reasons he

20   left ABC Nissan in March 2001.  When directly questioned as to why he left ABC Nissan,

21   Plaintiff answered, "I needed a better opportunity to make some more money, career

22   advancement."  (Pl. Dep. in Torres v. ABC Nissan at 7:20-22.)  Plaintiff made absolutely no

23   mention of racial harassment during this sworn testimony.  ABC Nissan urges the Court to find

24   there was no constructive discharge based on Plaintiff's prior testimony and the fact that

25   Plaintiff voluntarily returned to ABC Nissan just six months after first leaving.

26

27   _____

28       [13]The parties appear to assume this in their briefs, as it is not discussed.

1    Although Plaintiff has previously testified as to why he left and agrees that he returned

2    to work at ABC Nissan, the Court also notes other testimony Plaintiff has given.  At his

3    deposition in this case, Plaintiff testified that he approached John Schneider about transferring

4    from ABC Nissan to Camelback Toyota "[b]ecause I was having too much stress in the

5    environment – the environment in the fleet department where I was working was bad and so I

6    wanted to go to a different environment." (Pl. Dep. at 175:2-16.)  Regarding his return to ABC

7    Nissan, Plaintiff testified in this case that he called ABC Nissan and spoke with the new fleet

8    director about returning to work there.  (Id. at 195:19-197:3.) Plaintiff asked the fleet director

9    if things had changed at ABC Nissan, and he was told they had because Arnold and Schwelling

10   were no longer there.  (Id. at 197:4-9.) Plaintiff then told the fleet director "I might be interested

11   in coming back if I can work on my terms," which were to have afternoons and Sundays off.

12   (Id. at 197:10-21.)  Schneider agreed to those terms and Plaintiff returned to work at ABC

13   Nissan. (Id. at 197:15-18.)  At his deposition in this case, Plaintiff further testified that he

14   returned to ABC Nissan because he "needed the extra income."  (Id. at 198:4-6.)

15   Based on Plaintiff's testimony and taking the pertinent facts in a light most favorable to

16   Plaintiff, the Court concludes that a triable issue of fact exists on Plaintiff's constructive

17   discharge claim.  Whether a reasonable person would feel compelled to resign based on the

18   circumstances is ordinarily a question left to the jury, and the Court concludes that a jury could

19   find, taking all the facts in the light most favorable to Plaintiff, that a continuous pattern of

20   discriminatory treatment existed at ABC Nissan during Plaintiff's first period of employment.

21   Although credibility issues have been raised as to a number of people and incidents, the Court

22   leaves those questions for the jury to resolve.

23                    b.  Camelback Toyota and ABC Nissan: Second period of employment

24   To establish a constructive discharge, Plaintiff must show that a reasonable person would

25   be compelled to leave due to the discriminatory treatment.  See Schindrig, 80 F.3d at 1411.

26   "Where a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support

27   a hostile work environment claim, it will be impossible for her to meet the higher standard of

28   constructive discharge."  Brooks, 229 F.3d at 930.  Because the Court concluded in Section

1    II.B.1.b and c, *supra*, that Plaintiff cannot establish as a matter of law a hostile work

2    environment as to his employment with Camelback Toyota or his second period of employment

3    with ABC Nissan, Plaintiff's constructive discharge claims as to those periods of employment

4    must also fail.  Accordingly, the Court will grant ABC Nissan's Motion for Summary Judgment

5    as to Plaintiff's second period of employment constructive discharge claim and Camelback

6    Toyota's Motion for Summary Judgment as to Plaintiff's constructive discharge claim.[14]

7        3.  After-acquired evidence doctrine

8        ABC Nissan contends that under the after-acquired evidence doctrine, Plaintiff's

9    economic damages in this case should barred after October 6, 2003, the date Plaintiff testified

10   at his deposition that he had in fact been convicted of a felony when he had represented on his

11   employment applications that he had not.  Under the after-acquired evidence doctrine, an

12   employer's discovery of evidence that an employee could have been discharged for a non-

13   discriminatory reason may limit plaintiff's remedies.  ABC Nissan includes this argument in its

14   Motion for Summary Judgment; however, the after-acquired evidence doctrine "does not

15   warrant the granting of summary judgment," as it does not absolve an employer from liability.

16   Schindrig, 80 F.3d at 1412; see O'Day v. McDonnell Douglas Helicopter Co., 79 F.3d 756, 759

17   (9th Cir. 1996).[15]   Rather, the doctrine "bear[s] upon the specific remedy to be ordered."

18   _____

19       [14]Furthermore, the Court notes that Plaintiff himself testified that his decision to leave
20   Camelback Toyota was only *in part* because he was tired of the working environment.  Notably,
     Plaintiff testified in his deposition and trial testimony in an unrelated case, as well as his
21   deposition in this case, that he left because he wanted to make more money.  (Pl. Dep. in Torres
     v. ABC Nissan 7:23-8:3, Pl. Trial Testimony in Torres v. ABC Nissan 11:7-17, Pl. Dep. at
22   189:22-190:7.)  Plaintiff had a "90-day plan" where he would assess whether he was earning
     enough money; if he was not meeting his goals, Plaintiff would change jobs.  (Pl. Dep. at 190:8-
23   18, Pl. Trial Testimony in Torres v. ABC Nissan 11:7-17.) Leaving in part because he was "tired
24   of the working environment" at Camelback Toyota does not demonstrate that the environment
     was so intolerable that a reasonable person would feel compelled to leave.  (See Pl. Dep.
25   460:16-17.)
26

27       [15]The after-acquired evidence doctrine is applicable in Title VII cases, Rivera v. NIBCO,
     Inc., 364 F.3d 1057, 1071 (9th Cir. 2004); therefore, it also applies to this § 1981 action.  See
28   Manatt, 339 F.3d at 797 (holding that the legal principles guiding a court's analysis of a Title

1    Schindrig, 80 F.3d at 1412.  Regardless, the issue of damages is one that must be resolved prior

2    to trial, and in the interest of judicial economy, the Court will address ABC Nissan's arguments

3    at this time.[16]

4            On his employment application with ABC Nissan, Plaintiff indicated that he had not been

5    convicted of a felony when in fact he had been convicted of "false swearing," a Class 6 felony,

6    two years earlier.  (Pl. Dep. 41:2-11, Ex. C to ABC Nissan's SOF.) The application states that

7    false statements, material omissions, or misrepresentations of facts may disqualify the applicant

8    from consideration or result in discharge. (Ex. B to ABC Nissan's SOF Lederman Decl. ¶ 18.)

9    The sworn affidavit of Steve Lederman, controller for ABC Nissan, states that "had ABC Nissan

10   known that [Plaintiff] misrepresented a felony false swearing conviction in connection with

11   delinquent child support obligations when he completed his employment application, it would

12   not have hired him, or would have terminated his employment."  (Id.)  In response to ABC

13   Nissan's argument regarding this after-acquired evidence, Plaintiff argues that ABC Nissan "has

14   failed to adduce any evidence that it has ever not hired or terminated an employee under similar

15   circumstances." [Doc. No. 91 at 10.]  Plaintiff cites no legal support for his proposition. [Id.]

16           In O'Day, the Ninth Circuit applied the after-acquired evidence doctrine to a situation

17   similar to the circumstances at bar and found that an employer could prevail on this doctrine

18   where an affidavit by the employer averring that the employer would have terminated plaintiff

19   for his conduct is furnished and is corroborated by a company's policy and common sense.  79

20   F.3d at 762.  Contrary to Plaintiff's assertion, this Court "could hardly require employers in

21   these cases to come forward with proof that they discharged other employees for the precise

22   misconduct at issue."  Id.

23           Here, ABC Nissan has proffered the sworn affidavit of an official who avers that Plaintiff

24   would have been terminated or not hired in the first place if ABC Nissan had known of his

25   

26   VII claim "apply with equal force in a § 1981 action.")

27           [16]The Court also notes that Plaintiff did not contend in opposition to the Motion that the

28   after-acquired evidence argument is not properly raised.

1    misrepresentation on his application.   Also, the application itself states that any

2    misrepresentations, omissions, or false statements would result in termination or disqualification

3    of an applicant.   Furthermore, Plaintiff's prior conviction was for the precise conduct the

4    application specifically bars: making a false statement.   The Court therefore concludes that the

5    after-acquired evidence doctrine applies in this case.   Accordingly, should a jury find ABC

6    Nissan liable for backpay, it shall be limited "from the date of the unlawful discharge to the date

7    the new information was discovered." McKennon v. Nashville Banner Pub. Co., 513 U.S. 352,

8    362 (1995); O'Day, 79 F.3d at 759.   In addition, ABC Nissan "does not have to offer

9    reinstatement or provide front pay." O'Day, 79 F.3d at 759.

10                  4.  Camelback Toyota's Request for Attorneys' Fees

11          Camelback Toyota requests that the Court award it attorneys' fees in defending Plaintiff's

12    claims against it.[17] [Doc. No. 75 at 14-16.]   In Christianburg Garment Co. v. EEOC, the

13    Supreme Court held that a prevailing defendant in a Title VII case could be awarded attorneys'

14    fees if "a court finds that [plaintiff's] claim was frivolous, unreasonable, or groundless, or that

15    the plaintiff continued to litigate after it clearly became so." 434 U.S. 412, 422 (1978).   The

16    legal principles guiding a court's analysis of a Title VII claim "apply with equal force in a §

17    1981 action." Manatt, 339 F.3d at 797.

18          Here, Plaintiff has come forth with no evidence to support his belief that minority

19    customers are treated differently than non-minority customers, and Plaintiff's complaints about

20    his supervisors do not rise to the level of a hostile work environment.   Further, Plaintiff did not

21    report any alleged racial remarks by co-workers to management, so liability may not attach to

22    their comments.   Although it may not have been clear at the outset that his claims against

23    Camelback Toyota were not actionable, discovery and legal research would have clear to

24    Plaintiff that the conduct alleged simply does not rise to the level of a pervasive, hostile work

25

26

27          [17]Plaintiff did not address Camelback Toyota's request in his Opposition to Camelback

28    Toyota's Motion for Summary Judgment.

environment.  In addition, because Plaintiff cannot demonstrate a hostile work environment existed, Plaintiff's constructive discharge claim fails.

Thus, diligence on the part of Plaintiff would have made clear that Plaintiff could not prevail on his claims against Camelback Toyota.  Accordingly, the Court will award Camelback Toyota its reasonable attorneys' fees in defending against Plaintiff's claims. Camelback Toyota may file the appropriate claim pursuant to Rule 54.2 of the Rules of Practice of the United States District Court for the District of Arizona, effective December 1, 2005.

5.  Conclusion on ABC Nissan and Camelback Toyota's Motions for Summary Judgment

After carefully reviewing all the evidence before it, it is quite clear to the Court that the facts in this case are in dispute.  Taking those facts in the light most favorable to Plaintiff, genuine issues of material fact exist as to Plaintiff's claims regarding his first period of employment with ABC Nissan.  Accordingly, the Court will deny ABC Nissan's Motion for Summary Judgment as to that period of employment.  However, the Court concludes that even after taking the facts in the light most favorable to Plaintiff, Plaintiff has not demonstrated a hostile working environment or constructive discharge as a matter of law with regard to his employment with Camelback Toyota and his second period of employment with ABC Nissan. Consequently, the Court will grant ABC Nissan's Motion for Summary Judgment with respect to Plaintiff's second period of employment and grant Camelback Toyota's Motion for Summary Judgment and request for attorneys' fees.  Plaintiff's hostile work environment and constructive discharge claims concerning his first period of employment remain.  Finally, should a jury award Plaintiff backpay, Plaintiff's backpay award will be limited to backpay from the date of discharge until October 6, 2003, pursuant to the after-acquired evidence doctrine.

**C. Discussion: AIG-AZ's Motion for Summary Judgment**

Automotive Investment Group-Arizona, Inc. ("AIG-AZ") moves for summary judgment on the basis that it did not employ Plaintiff, directly or indirectly.  Plaintiff, however, counters

1     that AIG-AZ was his direct and indirect employer.[18]  Before turning to the facts in this case, the

2     Court first sets forth the legal standards regarding whether an entity is a direct or indirect

3     employer.

4           Regarding direct employment, "the *sine qua non* of determining whether one is an

5     employer is that an 'employer can hire and fire employees, can assign tasks to employees and

6     supervise their performance.'" EEOC v. Pac. Mar. Ass'n, 351 F.3d 1270, 1277 (9th Cir. 2003)

7     (quoting Clackamas Gastroenterology Assocs. v. Wells, 538 U.S. 440, 450 (2003)).

8           To be considered an indirect employer, an entity must have "some peculiar control over

9     the employee's relationship with the direct employer" and must also "engage in discriminatory

10     interference." Anderson v. Pac. Mar. Ass'n, 336 F.3d 924, 932 (9th Cir. 2003).  That is, the

11     indirect employer must either cause the hostile work environment or have the power to stop the

12     hostile work environment by being able to take corrective measures.  See id.

13           With these standards in mind, the Court now considers the record before it and

14     determines whether AIG-AZ was Plaintiff's direct or indirect employer.

15           1.  Whether AIG-AZ was Plaintiff's direct employer

16           First, Plaintiff contends that AIG-AZ was his direct employer.  In support of this

17     contention, however, Plaintiff cites no case law.  Rather, Plaintiff asserts that "as a 'condition

18     of employment,' [Plaintiff] was required to execute AIG's Anti-Harassment Policy, AIG's Drug

19     Testing Policy, AIG Credit History Release Form, and various other AIG Employee Benefits

20     Forms." [Doc. No. 89 at 2.] Plaintiff also notes that the President of AIG, Larry VanTuyl,

21     received a copy of an investigative report prepared in response to Plaintiff's call to the employee

22     hotline about David Arnold. [Id.] Plaintiff further argues that VanTuyl did not discipline Mr.

23

_____

24         [18]Plaintiff also asserted in his Amended Complaint that AIG-AZ, ABC Nissan, and

25     Camelback Toyota are "corporate alter-egos and 'joint' and/or 'single' employers" of Plaintiff.
    [Doc. No. 49, ¶ 13.] However, Plaintiff has made no mention of those theories of liability since

26     that time.  Furthermore, Plaintiff did not respond to AIG-AZ's arguments about those theories
    in his Response to AIG-AZ's Motion.  The Court's duty is not to make Plaintiff's arguments for

27     him.  Thus, the Court only addresses the two theories of liability in contention in the parties'

28     briefs:  direct and indirect employment.

1    Arnold and actually hired Mr. Arnold at other dealerships.  [Id. at 3.] In support of this assertion

2    about VanTuyl, Plaintiff cites to pages 9 and 10 of his Statement of Facts in opposition to ABC

3    Nissan's Motion for Summary Judgment [id.], but no such supporting evidence exists on those

4    pages.  Regardless, it is undisputed that Mr. Arnold was terminated from ABC Nissan, the

5    workplace where Plaintiff was located and the offensive conduct occurred.

6         Additionally, Plaintiff submits Arizona Corporation Commission filings that show AIG-

7    AZ, ABC Nissan, and Camelback Toyota share the same domestic address in Phoenix and have

8    the same president and secretary.  (Ex. 2 to Pl.'s SOF in Opp. to AIG-AZ's Mot.)  Finally,

9    Plaintiff points to numerous policies and memoranda authored by AIG, Inc. concerning such

10   topics as transfers between dealerships and anti-harassment policies.  (Exs. 3-14 to Pl.'s SOF

11   in Opp. to AIG-AZ's Mot.)

12        Throughout Plaintiff's Response to AIG-AZ's motion, Plaintiff repeatedly refers to "AIG"

13   rather than AIG-AZ.  This is a significant distinction, as the documents referenced by Plaintiff

14   in support of each of his assertions mention "AIG, Inc." or "AIG."  As shown by the Arizona

15   Corporation Commission report submitted by Plaintiff himself, AIG, Inc. was the predecessor

16   entity to ABC Nissan, Inc.  (Ex. 2 to Pl.'s SOF in Opp. to AIG-AZ's Mot.)  On March 11, 1999,

17   AIG, Inc. changed its name to ABC Nissan, Inc.[19]  (Id.)  AIG-AZ, on the other hand, is an auto

18   dealership management consulting company that was incorporated on December 30, 1998. (Id.,

19   see Exs. B-1 and B-2 to AIG-AZ's Mot.)  Indeed, on its Corporation Commission report, AIG-

20   AZ's business type is listed as "contractor."  (Ex. 2 to Pl.'s SOF in Opp. to AIG-AZ's Mot.)

21   Thus, it is clear from the record that AIG, Inc. and AIG-AZ are not the same entity.  Plaintiff,

22   in repeatedly referring to AIG-AZ as "AIG" and referencing documents that use "AIG, Inc." and

23   "AIG" interchangeably, seems to confuse the two entities.[20]  Furthermore, the Court notes that

24   _____

25        [19]ABC Nissan, Inc. is of course already a party to this action, and its Motion for

26   Summary Judgment has been addressed *supra*.

27        [20]AIG-AZ pointed out the distinction between the entities in some detail in its Reply.
     [Doc. No. 98] Plaintiff has not filed anything, i.e., a Motion for Leave to File a Sur-Reply or the
28   like, to clarify his position regarding the difference between AIG, Inc. and AIG-AZ.

1  at least one of the documents referenced by Plaintiff, the Employee Handbook, was likely

2  created before AIG-AZ was incorporated.  (See Ex. 13 to Pl.'s SOF in Opp. to AIG-AZ's Mot.

3  (handbook that references "AIG" and contains the footer "© 1998, AIG, Inc."); AIG-AZ was

4  incorporated on December 30, 1998.)

5        Plaintiff emphasizes the policies he was required to "execute," such as the anti-drug and

6  anti-harassment policies.  However, the forms refer to AIG, Inc., which ABC Nissan, Inc.

7  replaced via a name change.  (Ex. 2 to Pl.'s SOF in Opp. to AIG-AZ's Mot.)  The forms were

8  signed by Plaintiff in November 1999; the name change occurred in March 1999.  Plaintiff also

9  notes that he transferred from ABC Nissan to Camelback Toyota (as opposed to undergoing a

10 re-hiring process), and ABC Nissan used forms with its former name on them some months after

11 it underwent a name change.  However, an issue of triable fact as to the legal status of *AIG-AZ*

12 does not arise, because the evidence before the Court shows only that *AIG-AZ* is a consulting

13 group to auto dealerships that contracted with ABC Nissan and Camelback Toyota to "assist"

14 with, *inter alia*, "all subordinate personnel matters."  (Exs. B-1 and B-2 to AIG-AZ's Mot.)

15 Likewise, that the dealerships have the same office listed as AIG-AZ on the Corporation

16 Commission filing and have the same president and secretary does not demonstrate that AIG-

17 AZ does more than assist in some aspects of dealership management.

18        Moreover, to be considered a direct employer, an entity must have the power to hire and

19 fire employees, to assign tasks to employees, and to supervise their performance.  See EEOC

20 v. Pac. Mar. Ass'n, 351 F.3d at 1277.  Plaintiff has provided no evidence demonstrating that

21 AIG-AZ, a consulting company, had any the power to do any of those activities.  According to

22 the contractual arrangements between AIG-AZ and ABC Nissan or Camelback Toyota, AIG-AZ

23 will "assist" the dealerships in personnel matters.  Plaintiff has further provided no case law or

24 evidence supporting the contention that the contractual language provides AIG-AZ with the

25 power to hire, fire, assign tasks to, or supervise the dealerships' employees.  At the summary

26 judgment stage, Plaintiff must come forward and "make a showing sufficient to establish the

27 existence of an element essential to that party's case, and on which that party will bear the

28 burden of proof at trial." Celotex, 477 U.S. at 322.  Because Plaintiff has failed to do so, the

1   Court concludes that summary judgment is appropriate as to Plaintiff's direct employer theory

2   of liability on the part of AIG-AZ.

3          2.  Whether AIG-AZ is an indirect employer

4          As stated *supra*, an entity must have "some peculiar control over the employee's

5   relationship with the direct employer" and must also "engage in discriminatory interference" to

6   be an indirect employer.  Anderson v. Pac. Mar. Ass'n, 336 F.3d 924, 932 (9th Cir. 2003).  In

7   other words, the indirect employer must either cause the hostile work environment or have the

8   power to stop the hostile work environment by being able to take corrective measures.  See id.

9   To fall under the latter category, an entity must have more than a "limited" amount of power.

10  See id. An entity that has the power "to conduct investigations and implement new work site

11  rules to curb harassment" may have more than a limited amount of power.  See id. at 931-32.

12         Here, Plaintiff argues that AIG-AZ is an indirect employer because of its contractual

13  agreement with the dealerships and because "AIG required both ABC Nissan and Camelback

14  Toyota employees to execute AIG's Drug Free Workplace Policy, AIG's Credit History Release

15  Consent Form, and AIG's various Employee Benefit Forms, and, most important, AIG's Anti-

16  Harassment Policy." [Doc. No. 89 at 4.] Also, Plaintiff notes that the Employee Handbook

17  "expressly provides that the 'President of AIG' has the authority to change the terms of the

18  Employee Handbook." [Id.]

19         The Court, however, disagrees with Plaintiff's assertions.  As noted *supra*, the contracts

20  between AIG-AZ and ABC Nissan and Camelback Toyota merely state that AIG-AZ shall

21  "assist" the dealerships in personnel matters.  Furthermore, the proffered evidence does not

22  demonstrate that AIG-AZ "required" dealership employees to execute any forms or policies.

23  Rather, the documents referenced by Plaintiff mention AIG, Inc., which, as also discussed

24  *supra*, is a completely different entity than AIG-AZ.  Last, the Handbook, as the Court has

25  previously pointed out, was created by AIG, Inc., not AIG-AZ (and, for that matter, was likely

26  created before AIG-AZ was incorporated).  AIG-AZ therefore did not have the power Plaintiff

27  claims it did through the Handbook.

28

1   The evidence before the Court does not show that AIG-AZ, a dealership management

2   consulting company, either caused the hostile work environment Plaintiff alleges or had the

3   power to stop that hostile work environment by implementing corrective measures.  Plaintiff

4   has not shown that AIG-AZ conducted investigations for the dealerships.  To the contrary,

5   Plaintiff submits an investigation report conducted by AutoHR, Inc., not AIG-AZ, in response

6   to Plaintiff's complaint about David Arnold's use of a racial slur.[21] (Ex. 15 to Pl.'s SOF in Opp.

7   to AIG-AZ's Mot.) Also, Plaintiff has proffered no evidence that shows AIG-AZ has the power

8   to implement new work site rules in response to a hostile work environment.  Instead, Plaintiff

9   relies on forms that list an entity different from AIG-AZ.  The Court concludes that Plaintiff has

10  not demonstrated that AIG-AZ is an indirect employer under applicable Ninth Circuit law.

11  Accordingly, the Court will grant summary judgment as to this theory of liability.  See Celotex,

12  477 U.S. at 322.

13  **C.  Conclusion as to AIG-AZ's Motion for Summary Judgment**

14      Plaintiff has not shown that AIG-AZ, an auto dealership management consulting

15  company, either hired, fired, supervised, or assigned tasks to dealership employees.  Thus,

16  Plaintiff's direct employer theory of liability fails as a matter of law.  In addition, Plaintiff has

17  failed to demonstrate that AIG-AZ either caused the hostile work environment he alleges or had

18  the power to stop that hostile work environment.  Plaintiff's indirect employer theory of liability

19  consequently must also fail as a matter of law.

20      Because Plaintiff has failed to show that AIG-AZ was his employer, either directly or

21  indirectly, the Court will grant AIG-AZ's Motion for Summary Judgment.

22              **III.  CONCLUSION**

23      Accordingly, for the reasons set forth above,

24      **IT IS ORDERED** that Defendant ABC Nissan, Inc.'s Motion for Summary Judgment

25  [Doc. No. 79] is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's hostile work

26  environment and constructive discharge claims as to his first period of employment with ABC

27  _____

28      [21]The Court refers to the report without ruling on its admissibility in this case.

1   Nissan remain, and Plaintiff's hostile work environment and constructive discharge claims as

2   to his second period of employment with ABC Nissan are dismissed.

3        **IT IS FURTHER ORDERED** that Defendant CTVT Motors, Inc. (aka Camelback

4   Toyota, Inc.)'s Motion for Summary Judgment [Doc. No. 75] is **GRANTED**.  CTVT Motors,

5   Inc. (aka Camelback Toyota, Inc.) shall no longer be a party to this matter.  CTVT Motors, Inc.

6   (aka Camelback Toyota, Inc.) may file a claim for reasonable attorneys' fees in accordance with

7   LR Civ. 54.2.

8        **IT IS FURTHER ORDERED** that Defendant Automotive Investment Group-Arizona,

9   Inc.'s Motion for Summary Judgment [Doc. No. 77] is **GRANTED**.  Automotive Investment

10  Group-Arizona, Inc. shall no longer be a party to this action.

11         DATED this 4th day of August, 2006.

12

13

14

15                      Stephen M. McNamee
                        United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28